# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFFERY J. DORMU,

        Plaintiff,

        v.

DISTRICT OF COLUMBIA, et al.,

        Defendants.

Civil Action 08-00309  (HHK)

## MEMORANDUM OPINION

Jeffery J. Dormu, an African American, brings this action against the District of
Columbia ("District") as well as Scott S. Pinto, Maurice C. Clifford, Jeffery P. Janczyk, and
Ramey Kyle—all officers of the Metropolitan Police Department ("MPD") (collectively,
"defendants").  This case arises out of an encounter between Dormu and the four police officers
while Dormu sat in his car across the street from his mother's house.  The encounter ended in
Dormu being arrested for, charged with, and eventually acquitted of disorderly conduct and
failure to obey a police officer.  Dormu's causes of action are based on 42 U.S.C. § 1983 as well
as common law claims of assault and battery, false arrest, false imprisonment, malicious
prosecution, abuse of process, negligence, and negligent hiring, retention and supervision.[1]
Before the Court is defendants' motion for summary judgment or, in the alternative, for judgment
on the pleadings [#26].  Also before the Court is Dormu's motion seeking leave to file a
supplemental expert affidavit [#43], and defendants' motion to strike that supplement [#41].

---

[1]     Dormu's complaint also asserted a claim of intentional infliction of emotional
distress.  *See* Compl. ¶¶ 20–21.  Dormu subsequently abandoned that claim.  *See* Pl.'s Opp'n to
Defs.' Mot. for Summ. J. and/or J. on the Pleadings ("Pl.'s Opp'n") at 6.

Upon consideration of the motions, the opposition thereto, and the record of this case, the Court concludes that summary judgment in favor of defendants must be granted in part and denied in part. The Court also concludes that Dormu should be granted leave to file the supplemental expert affidavit, and that defendants' motion to strike the affidavit should be denied.

## I. BACKGROUND

The events giving rise to this case began on a residential street in the District of Columbia on February 23, 2007 at about 6:00 p.m. Dormu, a vascular surgeon traveling from New Jersey, was visiting his family and was parked outside his family's home on the 1200 block of Crittenden Street, N.W. Pl.'s Opp'n, Ex. 1 at 12–14 (Dep. of Dormu); Compl. ¶ 5. Sitting in a Mercedes-Benz with tinted windows and talking on a cellular telephone, Dormu was approached by Officers Pinto, Clifford, Janczyk, and Kyle. Pl.'s Opp'n, Ex. 1 at 12–14, 16 (Dep. of Dormu); Compl. ¶ 5.

According to the evidence Dormu has adduced, which the Court must accept at this stage in the proceedings, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the four officers approached his car from both sides with their guns drawn. Pl.'s Opp'n, Ex. 1 at 15 (Dep. of Dormu). One officer shined a flashlight on Dormu. *Id.* An officer then instructed Dormu to "get the fuck off the phone." *Id.* Dormu ended his phone conversation. *Id.* at 15–16.

One of the officers remarked that Dormu's car had tinted windows. *Id.* at 16. Dormu responded that his car was registered in New Jersey, to which one of the officers allegedly said, "[w]ell, that's illegal here and the mayor said that we can search you, search your vehicle and arrest you for having tinted windows." *Id.* at 16–17. Believing that "the officers were speaking pretty disrespectful[ly] to me," Dormu "pick[ed] up my phone to try to call into my mother's

house so someone could come out and witness what was going on." *Id.* at 17. Janczyk responded by telling Dormu to "hang the fucking phone up," which he did. *Id.*

After seeing his mother's neighbor on the sidewalk, Dormu "hollered out the window [to ask] could he go to my mother's house and alert them to what's going on here." *Id.* The neighbor apparently did as requested. *Id.* Dormu recalls that the officers "kept being disrespectful saying different curse words to me." *Id.* He remembers telling Janczyk that he was a "tax-paying law-abiding citizen" and a surgeon. *Id.* at 17–18. According to Dormu, Janczyk "then said to me shut the fuck up, you're nothing but another nigger in a Mercedes-Benz." *Id.* at 18.

Dormu saw his mother, brother, and nephew leave the house. *Id.* When they approached the sidewalk, he saw Clifford meet them. *Id.* Dormu recalls telling his mother to go back in the house. *Id.* at 29. In addition, Dormu remembers asking Janczyk "why am I being harassed, I didn't do anything wrong." *Id.* at 18. Janczyk replied, "[w]ell, I told you to shut the fuck up, so now you're going to jail." *Id.*

As Dormu recalls, Janczyk then "reached in the car to grab me. So instead of him trying to pull me through the door or the window, I opened the car door and he grabbed me, grabbed my arm." *Id.* Dormu remembers Janczyk twisting and extending his arm, then "slamm[ing]" him on the car, putting handcuffs on him, and escorting him to the police vehicle. *Id.* Dormu perceived the handcuffs to be on him "very tightly," *id.* at 37, and brought this to Janczyk's attention. *Id.* Janczyk, according to Dormu, "pretty much ignored me. One time I said it and then another time

I said it, he said shut the fuck up." *Id.* According to Dormu, he did not resist the officers. *Id.* at 36.[2]

The officers placed Dormu under arrest for failing to obey a police officer and disorderly conduct. Defs.' Statement of Material Fact ¶ 17. He also received a ticket for a window tint violation. Defs.' Mot. for Summ. J., Ex. 2 (Defs.' Interrog. Resps.) at 8.[3] The officers took Dormu to the Fourth District station, where he had his fingerprints taken, he was placed in a cell, and his handcuffs were removed. Pl.'s Opp'n, Ex. 1 at 31 (Dep. of Dormu); Defs. Mot. for Summ. J., Ex. 1 at 27 (Dep. of Dormu).

According to Dormu, two officers came to his cell to speak to him—one of whom was Clifford, and the other of whom Dormu does not remember. Pl.'s Opp'n, Ex. 1 at 31 (Dep. of Dormu). As recalled by Dormu, Clifford "stated that what happened didn't really have to happen" and that Janczyk "is a hothead." *Id.* Clifford also said that if Dormu wanted to "make a complaint, I don't care because I have a stack of complaints already against me." *Id.* at 32. Dormu was released from the Fourth District approximately four or five hours after his arrival. *Id.* at 33.

---

[2]     The defendants have introduced some evidence that, if credited, could cause the fact-finder to view Dormu's behavior less innocuously. In defendants' response to Dormu's interrogatories, defendants state that "Mr. Dormu stated that no one disrespects his mother, and that he would kill anyone who did so." Defs.' Mot. for Summ. J. and/or Mot. for J. on the Pleadings ("Defs.' Mot. for Summ. J."), Ex. 2 (Defs.' Interrogatory Responses) at 9. In addition, Janczyk stated in his deposition that Dormu was verbally "combative" during the encounter. Pl.'s Opp'n, Ex. 2 at 78 (Dep. of Janczyk).

[3]     According to Dormu, this ticket was later dismissed in traffic court. *See* Pl.'s Opp'n, Ex. 1 at 19 (Dep. of Dormu).

Dormu was tried on the charges of disorderly conduct and failure to obey a police officer. *See generally* Pl.'s Opp'n, Ex. 10 (Transcript/Findings of the Hon. Marisa Demeo). He was acquitted of both charges. *Id.* Dormu nonetheless continues to experience the effects of the arrest. According to his deposition testimony, he experiences pain and numbness in his right wrist, a problem for which he has received surgery. Defs.' Mot. for Summ. J., Ex. 1 at 37–44 (Dep. of Dormu). As a consequence, Dormu has stopped performing surgeries that require a certain level of muscle strength. *Id.* at 44.

## II. ANALYSIS

### A. Legal Standard

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002). A material fact is one that is capable of affecting the outcome of the litigation. *Anderson*, 477 U.S. at 248. A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the non-movant and believe the non-movant's evidence. *Id.* at 255. The court will not, however, make credibility determinations or weigh the evidence. *Id.* at 249. Thus, the Court does not "'determine the truth of the matter,' but instead decide[s] only 'whether there is a genuine issue for trial.'" *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (quoting *Anderson*, 477 U.S. at 249).

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A moving party may succeed by pointing to the absence of evidence proffered by the non-moving party.  *Id.* at 322, 325.

To defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials.  *Id.* at 324.  Instead, the non-moving party must provide affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *Id.*[4]

## B.    Liability of Individual Officers for Section 1983 Claims

Dormu alleges that the individual officers violated his rights under the Fourth Amendment by subjecting him to false arrest and by using excessive and unreasonable force in effecting that arrest.  Compl. ¶¶ 26–27; Pl.'s Opp'n at 8–15.[5]  Defendants counter that the officers are entitled to summary judgment on these claims because they are shielded from liability by the doctrine of qualified immunity.  The Court concludes that the individual officers are not protected by qualified immunity with respect to Dormu's Fourth Amendment false arrest

---

[4]       In the alternative, defendants move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  Because both parties have presented material outside the pleadings, and because the Court has relied upon such material, defendants' motion is treated solely as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

[5]       Neither Dormu's complaint nor his memorandum of law specify that his charges of false arrest and excessive force arise under the Fourth Amendment.  The Court nonetheless treats these as Fourth Amendment claims, both because the Fourth Amendment protects against unreasonable seizures, *see infra*, and because Dormu's complaint clearly alleges that defendants have violated his Fourth Amendment rights, *see* Compl. ¶¶ 26–27.  *See also Graham v. Connor*, 490 U.S. 386, 394–95 (1989) (providing that when "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment").

claim.  On the issue of excessive force, the Court finds that Kyle, Clifford, and Pinto are entitled to qualified immunity, but that Janczyk is not.[6]

The Fourth Amendment to the United States Constitution guarantees the right of citizens "to be secure in their persons . . . against unreasonable searches and seizures."  U.S. CONST. amend. IV.  For a warrantless arrest to comport with the Fourth Amendment's protection against unreasonable seizures, the arrest "must be predicated on particularized probable cause."  *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006).  The "Fourth Amendment's freedom from unreasonable searches and seizures [also] encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham*, 490 U.S. at 394–95).  To enforce these rights, citizens may bring claims under 42 U.S.C. § 1983.  *See Graham*, 490 U.S. at 394.[7]

---

[6]     Dormu's complaint also asserted claims against the individual officers under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.  *See* Compl. ¶¶ 26–27.  Defendants moved for judgment in their favor on these claims, and Dormu did not respond.  Accordingly, defendants' motion for summary judgment is granted with respect to these claims.  *See Bryant v. Pepco*, 730 F. Supp. 2d 25, 29 (D.D.C. 2010) (granting defendant's motion to dismiss certain counts of plaintiff's complaint where plaintiff failed to respond to defendant's challenges to those claims).

[7]     42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court set forth a two-step process for determining whether qualified immunity should apply in a particular case. The first inquiry under *Saucier* is whether the facts, taken in the light most favorable to the party claiming to have been injured, show that the government official's conduct violated a constitutional right. *Id.* at 201. If no constitutional right was violated, qualified immunity is appropriate. *Id.* If the plaintiff's rights were violated, the court must next assess whether, "in light of the specific context of the case," the right in question was "clearly established." *Id.* A right is "'clearly established'" if "'the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The sequence of the two steps is now discretionary, as the Supreme Court has made clear that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

### 1.     False Arrest under the Fourth Amendment

With respect to Dormu's Fourth Amendment false arrest claim, the second step of the *Saucier* analysis—deciding whether a constitutional right was well-established—is not controversial. That is because "[i]t is well settled that an arrest without probable cause violates

the [F]ourth [A]mendment." *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987). What the

parties dispute is whether, in this case, the officers had probable cause to arrest Dormu.

    In determining whether probable cause exists, courts examine "the reasonable conclusion

to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v.*

*Alford*, 543 U.S. 146, 152 (2004). The inquiry is based on the "'totality of the circumstances,'

which requires that 'the police had enough information to warrant a man of reasonable caution in

the belief that a crime has been committed and that the person arrested has committed it.'"

*Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 18 (D.D.C. 2009) (quoting *Illinois v. Gates*,

462 U.S. 213, 230 (1983); *Barham*, 434 F.3d at 572). The arresting officer's subjective state of

mind is irrelevant to the inquiry. *Devenpeck*, 543 U.S. at 153. Qualified immunity is appropriate

"even if [the officer] reasonably but mistakenly concluded that probable cause existed."

*Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993) (internal citation and quotation marks

omitted).

    Dormu contends that defendants lacked probable cause to arrest him. Pl.'s Opp'n at

8–14. Defendants respond that they had probable cause to arrest Dormu both for disobeying a

police officer and for disorderly conduct. Defs.' Mem. in Supp. of Summ. J. at 14–19.[8]

---

[8]     In a footnote in their reply memorandum, defendants contend that Dormu "does not dispute that the officers are entitled to qualified immunity because probable cause existed to initiate the traffic stop and to arrest plaintiff for failure to obey a police officer." Defs.' Reply Mem. in Supp. of Summ. J. ("Defs.' Reply") at 4 n.1. In support of this proposition, defendants cite to pages 17 through 18 of Dormu's opposition brief. Those pages include Dormu's argument regarding qualified immunity. Although that section of Dormu's brief does not address probable cause for failure to obey, other portions of Dormu's brief do. The Court therefore cannot agree with defendants' contention that Dormu "does not dispute" that the individual officers are entitled to qualified immunity on this issue.

Defendants maintain that they had probable cause to arrest Dormu for failure to obey under 18 DCMR § 2000.2[9] because, as Dormu stated in his deposition, he was instructed by the officers to hang up his cell phone and then, at a later point, tried to make a phone call. *Id*. at 17. Dormu counters that defendants' description "mischaracterizes the events of the traffic stop." Pl.'s Opp'n at 12. Dormu argues that when the officers first instructed him to hang up his cell phone he "immediately complied and terminated the call." *Id.* When he later picked up his cell phone to call his mother's house and was ordered to "'hang the fucking phone up,'" Dormu "immediately complied." *Id.* (quoting Pl.'s Opp'n, Ex. 1 at 17 (Dep. of Dormu)). Dormu contends that rather than failing to obey an officer, he "obeyed two distinct orders from the traffic officer, both of which happened to concern his cell phone." *Id.* at 12.

Dormu's argument has merit. According to the facts presented by Dormu, the officers at no time instructed Dormu to refrain from placing any future phone calls. There was therefore no lawful order which Dormu could have violated when Dormu later attempted to call his mother's house. Necessarily, then, Dormu complied with all of the officers' orders regarding the use of his cell phone. Viewing the facts in the light most favorable to Dormu, it would not have been reasonable for the officers, based on the facts known to them at the time, to believe that they had probable cause to arrest Dormu for failure to obey a police officer due to his calling his mother's house.

---

[9]    18 DCMR § 2000.2 provides:
No person shall fail or refuse to comply with any lawful order or direction of any police officer . . . invested by law with authority to direct, control, or regulate traffic. 18 DCMR § 2000.2. The parties do not dispute whether the officers' orders with respect to Dormu's use of his cellular phone were "lawful." *See generally* Pl.'s Opp'n.

Defendants also argue that they had probable cause to arrest Dormu for failure to obey a police officer because he attempted to open the door to get out of the car during the traffic stop. Defs.' Mem. in Supp. of Summ. J. at 17. Defendants, however, do not offer any evidence demonstrating that they had previously instructed Dormu to keep his car door closed. To the contrary, Dormu testified during his deposition that he was never asked to remain in his vehicle. Pl.'s Opp'n, Ex. 1 at 30 (Dep. of Dormu). Accepting Dormu's version of events, the Court concludes it would have been unreasonable for the officers to believe that Dormu's opening the car door provided probable cause to arrest him for failure to obey, given that Dormu had not been ordered to refrain from opening the door.[10] Thus, with respect to both Dormu's use of his cell phone and his opening the car door, no reasonable officer could have believed that there was a basis to arrest Dormu for failure to obey a police officer.

The Court next examines whether probable cause existed to arrest Dormu for disorderly conduct. In relevant part, the D.C. disorderly conduct statute, D.C. Code § 22-1321, applies to any individual who, "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby" either "(1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others . . ." or "(3) shouts or makes a

---

[10]    In their reply memorandum, defendants put forward a new argument: that "regardless" of whether Dormu had previously been instructed to keep his car door closed, the car door incident still gave them probable cause to arrest Dormu for failure to obey a police officer "and/or to believe that their safety was in danger." Defs.' Reply at 6. To the extent defendants contend that a police officer has probable cause to arrest an individual for failure to obey when an individual has not failed to obey, the Court rejects that argument. To the extent they argue that officers have probable cause to arrest for failure to obey due to concerns about their own safety (and not an individual's failure to obey), the Court similarly rejects that proposition because "it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n. 5 (D.D.C. 2008).

noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons . . . ." D.C. Code § 22-1321. Under this statute a person is guilty of committing disorderly conduct only if the conduct "'occur[s] under circumstances such that a breach of peace may be occasioned thereby.'" *Shepherd v. District of Columbia*, 929 A.2d 417, 418 (D.C. 2007) (quoting *Chemalali v. District of Columbia*, 655 A.2d 1226, 1228 (D.C. 1995)). The breach of the peace requirement applies to conduct proscribed both under subsection (1) and subsection (3). *See In re T.L.*, 996 A.2d 805, 810 (D.C. 2010). Circumstances in which a breach of the peace may be occasioned include where an individual's words are likely to produce violence on the part of others, *Rodgers v. United States*, 290 A.2d 395, 397 (D.C. 1972), and where an individual produces unreasonable and excessive noise, *In re T.L.*, 996 A.2d at 813–14.

The evidence is clear that, as a result of Dormu communicating with his mother's neighbor George Lewis, Dormu's family members came out to the street. But disorderly conduct does not occur merely because a crowd gathers to watch a citizen-police encounter. *See Shepherd* , 929 A.2d at 419 (reversing a conviction for disorderly conduct where crowds gathered around a police officer issuing a ticket for defendant having gone through a Metro gate without paying the fare because no more than a "bare possibility" existed that the defendant's conduct was calculated to lead to a breach of the peace).

The evidence is less clear as to what additional circumstances were present. Defendants describe Dormu's behavior as boisterous—asserting that he "yelled" and "hollered" during the encounter. Defs.' Mot. for Summ. J. at 18. They also argue that it was reasonable for the officers to believe that Dormu's behavior could provoke a breach of the peace because the encounter took place in a "high crime area where a murder had taken place the week before,"

because Dormu's mother asked the officers why Dormu was being arrested, and because "[d]uring the time that all of this was happening, Plaintiff attempted to open the door and get out of his vehicle." *Id.*

Dormu, however, presents a much calmer picture—one in which his words were neither likely to produce violence, *Rodgers*, 290 A.2d at 397, nor result in unreasonable and excessive noise, *In re T.L.*, 996 A.2d at 813–14. Under Dormu's version of the facts, he maintained his composure throughout the encounter. Defs.' Mot. for Summ. J., Ex. 1 at 28–29 (Dep. of Dormu). According to Dormu's evidence, Dormu did not make any request of his family members or ask that they intervene. Pl.'s Opp'n, Ex. 3 at 106 (Tr. Test. of George Lewis). In addition, Lewis did not hear Dormu threaten the officers or say anything offensive to them. *Id.* at 101. At this stage in the proceedings, during which the Court may not engage in credibility determinations or weigh the evidence, the Court must believe the evidence produced by the non-moving party. *Anderson*, 477 U.S. at 255, 249. Thus viewing the evidence in the light most favorable to Dormu, the Court concludes that no reasonable officer could believe that probable cause existed with respect to disorderly conduct because Dormu did not act in such a way that could have occasioned a breach of the peace.

Under the second step of the qualified immunity analysis, the officers would nonetheless be immune from suit if Dormu's Fourth Amendment rights were not clearly established at the time of the arrest. *Saucier*, 533 U.S. at 202. As discussed *supra*, the parties do not dispute that the right to be free from arrest without probable cause is well established. Moreover, under Dormu's version of the events, no reasonable officer could find in light of clearly established law

that Dormu failed to obey a police officer or engaged in disorderly conduct. Thus, the individual officers are not entitled to qualified immunity for wrongful arrest.

## 2. Excessive Force under the Fourth Amendment

Dormu's excessive force claim grows out of the encounter described above and is also analyzed under the Fourth Amendment. *See Graham*, 490 U.S. at 394–95. Defendants seek summary judgment on Dormu's claim of excessive force, arguing that defendants' restraint of Dormu during the course of the arrest was appropriate. Defs.' Mot. in Supp. of Summ. J. at 19–20. Dormu rejoins that defendants employed excessive force when they refused to adjust the handcuffs after Dormu complained of their tightness. Pl.'s Opp'n at 14–15.[11]

In evaluating excessive force claims, the inquiry under the first step in *Saucier*—whether a constitutional right has been violated—is governed by an objective reasonableness standard. *Graham*, 490 U.S. at 396–97. Under that standard, "an officer has the authority to use 'some degree of physical coercion or threat thereof' during the course of an arrest, and 'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Rogala v. District of Columbia*, 161 F.3d 44, 55 (D.C. Cir. 1998) (quoting *Graham*, 490 U.S. at 395–97). This analysis is conducted by considering each individual officer's conduct. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions."); *accord Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007); *Wilson v. City of Des Moines,* 293 F.3d 447, 453 (8th Cir.

---

[11] Although Dormu makes several references to his arm having been hyper-extended and twisted, his argument regarding excessive force is limited to the issue of handcuffing. *See* Pl.'s Opp'n at 15 ("That none of the defendants examined or adjusted the handcuffs when plaintiff complained about the pain, raises their conduct to the level of excessive force.").

2002); *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000) (citing *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996)).

In determining whether an officer's use of force was reasonable, courts consider the severity of the crime at issue, whether the plaintiff was actively resisting or attempting to evade arrest, and whether the plaintiff posed an immediate threat to the officer's or others' safety. *Graham*, 490 U.S. at 396. The severity of the injury the plaintiff suffered is also relevant. *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993) (stating that although the severity of injury "is not by itself the basis for deciding whether the force used was excessive, . . . it is a relevant factor").

Here, Dormu alleges that Janczyk placed handcuffs on him that were excessively tight. Pl.'s Opp'n, Ex. 1 at 37 (Dep. of Dormu). He also contends that Janczyk refused to respond to his complaints about the tightness. *Id.* Dormu maintains that throughout the encounter he did not resist the officers. *Id.* at 36.

Dormu avers that as a result of the force Janczyk applied, he continues to experience pain and numbness in his right wrist; that he received surgery for this problem; and that he has stopped performing surgeries that require a certain level of muscle strength. Defs.' Mot. for Summ. J., Ex. 1 at 37–44 (Dep. of Dormu). To support his claims of injury, Dormu has submitted a letter from one of his treating physicians. In that letter, Dormu's physician states that while he has "released [Dormu] to resume all activities," Dormu's right wrist and hand "are clearly not normal." Pl.'s Opp'n, Ex. 11 at 2 (Letter from Richard W. Barth, Physician of Jeffery J. Dormu, to Kenneth M. Trombly, Attorney of Jeffery J. Dormu (Mar. 15, 2010) (attached to Aff. of Richard W. Barth)). Dormu's physician further states that "[b]ecause of his persistent

sense of weakness and numbness in the small and ring finger, Dr. Dormu feels that he is putting his patients at risk by performing open thoracic and abdominal procedures." *Id.*

Applying the *Graham* factors to the facts in this case and considering the conduct alleged with respect to each officer, the Court concludes that Dormu has alleged facts that, viewed in the light most favorable to him, would allow a reasonable juror to find that Janczyk violated Dormu's right under the Fourth Amendment to be free of excessive force. A reasonable juror could find that Janczyk violated Dormu's constitutional right because the circumstances surrounding Dormu's arrest were quite benign. In particular, Dormu was not arrested for any violent crime and Dormu did not resist arrest. In addition, the severe nature of Dormu's injury reflects that excessive force may have been used. *See Wardlaw*, 1 F.3d at 1304 n.7. It is possible that the fact-finder in this case will determine that Janczyk had a legitimate reason for maintaining Dormu's handcuffs in a tight position. It is also possible that a fact-finder will conclude that Dormu's injury was not as severe as he contends. But at this stage in the proceedings, during which the Court must view the alleged material facts in favor of Dormu, Dormu has put forward enough facts that would allow a juror to conclude that no reasonable officer could have believed in the necessity of maintaining the tightness of Dormu's handcuffs.

Dormu, however, has not alleged any facts to suggest that Clifford, Kyle or Pinto violated Dormu's rights, as Dormu has not provided any evidence to suggest that they were involved in the application of the handcuffs or heard his complaints about the tightness of the cuffs. The Court therefore grants summary judgment in their favor with respect to Dormu's Fourth Amendment excessive force claims.

Moving to the second step under *Saucier*, the Court must determine whether the constitutional right at issue was clearly established at the time of Dormu's arrest. In addressing this second step, "courts must frame their inquiry at the right 'level of generality.'" *Barham*, 434 F.3d at 572 (quoting *Creighton*, 483 U.S. at 639). "In other words, it is not enough to say that it is clearly established that police officers may not subject individuals to unreasonable searches and seizures." *Id.* Instead, the relevant inquiry is whether "'the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] . . . was unconstitutional.'" *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In determining whether officers exceeded their authority, the Court looks to cases from the Supreme Court, the D.C. Circuit, and other courts for principles "exhibiting a consensus view." *Id.*

This case presents the question of whether, at the time of Dormu's arrest, an individual had a clearly established right to be free from a police officer's injury-inducing application of handcuffs after the individual complained that the cuffs were too tight. Neither the D.C. Circuit nor the Supreme Court have specifically addressed this question. The consensus among other courts, however, is overwhelming. Almost every Court of Appeals has held that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury or where an individual complains about the overly-tight cuffing. *See, e.g.*, *Howard v. Kansas City Police Dep't.*, 570 F.3d 984, 991 (8th Cir. 2009) (finding it clearly established that the Fourth Amendment prohibited officers from unreasonably ignoring complaints that unduly tight handcuffs were causing more than minor injury); *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005) (holding that the Fourth Amendment bars too-tight handcuffing where a plaintiff

demonstrates some physical injury from the handcuffing and officers ignored complaints); *Wall v. County of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that overly tight handcuffing can constitute excessive force."); *Kopec v. Tate*, 361 F.3d 772, 774 (3d Cir. 2004) (reversing summary judgment for defendant where handcuffs caused plaintiff extreme pain and permanent nerve damages); *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) (finding summary judgment for defendant inappropriate where plaintiff complained of too-tight handcuffs); *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (holding reasonable juror could find use of excessive force where plaintiff alleged she was injured from too-tight handcuffs); *Bastien v. Goddard*, 279 F.3d 10, 12 (1st Cir. 2000) (reviving excessive force claim where plaintiff repeatedly complained that handcuffs had been applied too tightly and was diagnosed with injury); *Heitschmidt v. City of Houston*, 161 F.3d 834, 839–40 (5th Cir. 1998) (denying qualified immunity where plaintiff alleged overly tight handcuffs caused serious and permanent injury to his wrists and where he requested that the handcuffs be loosened). Thus, it was clearly established at the time of Dormu's arrest that he had the right to be free from injury-inflicting handcuffing where Dormu complained about the tightness of the cuffs.

In concluding that a reasonable officer would have known at the time of Dormu's arrest that the alleged conduct was in violation of the Fourth Amendment, the Court is mindful of the district court opinion in *Barham v. Ramsey*, 338 F. Supp. 2d 48, 67 (D.D.C. 2004), *aff'd on other grounds*, 434 F.3d 565 (D.C. Cir. 2006). In *Barham*, the district court considered whether the use of cuffs (specifically, "flexi-cuffs"), "without more," amounted to excessive force. *Id.* The plaintiffs in that action "provided no evidence" to indicate they were not handcuffed in a way that veered from "standard fashion" and there were no allegations "that the manner in which plaintiffs

were handcuffed at the time of arrest was unique or abnormally oppressive." *Id.* Relying on *Rodriguez v. Farrell*, 294 F.3d 1276 (11th Cir. 2002) and *Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001), the court concluded that there was no clearly established law indicating that cuffing "without more" could violate the Fourth Amendment. *Id. Barham*, *Rodriguez* and *Glenn* are all distinguishable from the present case. In *Barham*, the court's decision indicates that there was no evidence of any injury. In *Glenn*, the plaintiff failed to show more than a de minimis injury. And in *Rodriguez*, the plaintiff never requested that the handcuffs be adjusted. Because of these factual distinctions, neither *Barham*, *Glenn*, nor *Rodriguez* undermines the Court's conclusion that a reasonable officer in Janczyk's position would have known that his conduct violated the Fourth Amendment. Accordingly, the Court concludes that Janczyk's conduct is not shielded by qualified immunity.

**C.      Municipal Liability under § 1983**

The Supreme Court has limited municipalities' liability under § 1983. "*Respondeat superior* or vicarious liability will not attach [to municipalities] under Section 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), a city can only be held liable under § 1983 where its own "policy or custom . . . inflicts the injury." Liability exists not only for formal policies "approv[ed] through the body's official decisionmaking channels," but also includes government practices "so permanent and well settled as to constitute a 'custom or usage . . . .'" *Id.* at 691 (citation omitted).

Defendants argue that Dormu has failed to produce evidence that the District maintained a custom or policy that deprived him of his civil rights. Consequently, defendants maintain that

19

the District is entitled to summary judgment on Dormu's causes of action against the District under § 1983.

In response, Dormu points to the affidavit submitted by his police expert, Robert W. Klotz. In the affidavit, Klotz states that "[o]ver the period of time that includes the date of Dr. Dormu's arrest, the [MPD] has engaged in a pattern and practice of unlawful disorderly conduct arrests without probable cause, for the purpose of summarily punishing the citizen." Pl.'s Opp'n, Ex. 6 ¶ 13 (Aff. of Klotz). In support of this assertion, Klotz cites to a 2003 report issued by the Citizen Complaint Review Board that, according to Klotz, addressed the issue of disorderly conduct arrests. *Id.* ¶ 12. Klotz further avers that the District's disorderly conduct arrest rate is two to four times higher than the national rate. *Id.* ¶ 11.[12] The affidavit also appears to offer Dormu's own arrest as proof of the custom or policy. *See id.* ("Dr. Dormu's arrest was an example of such an arrest.").

Finally, Dormu cites testimony from Clifford's deposition in which Clifford stated that had Dormu reacted differently, the officers "would have walked away." Pl.'s Opp'n, Ex. 9 at 40 (Dep. of Clifford). According to Dormu, Clifford's testimony is "emblematic of the [MPD's] larger problem of illegal disorderly conduct arrests and a significantly high disorderly conduct arrest rate as compared to nationwide rates." Pl.'s Opp'n at 20.

Even when the evidence and the reasonable inferences drawn from the evidence are viewed in the light most favorable to Dormu, he has not presented evidence on the basis of which a reasonable juror could find that the District had a policy or custom that caused the violation of

---

[12]     Klotz's affidavit does not state the source of that statistic; however, his expert report indicates that it comes from the 2003 report issued by the Citizen Complaint Review Board. *See* Defs.' Mem. in Supp. of Summ. J., Ex. 5 at 4 (Expert Report of Klotz).

his constitutional rights. Dormu's failure to provide a copy of the 2003 report makes it impossible for the Court to know exactly what the report recounted. Assuming that Klotz's description is accurate, the evidence in the record demonstrates only that as of 2003, the District had an unusually high disorderly conduct arrest rate. Even assuming that a policy or custom did exist in 2003, the only evidence that such a policy or custom continued after 2003 is Dormu's own arrest and Clifford's explanation of the arrest during his deposition. A single instance of unlawful conduct is not enough to demonstrate a policy or custom. *See Parker v. District of Columbia,* 850 F.2d 708, 711–12 (D.C. Cir. 1988) ("'[P]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . .'" (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).

Furthermore, Dormu has failed to satisfy the causation requirement of municipal liability. *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (observing that the policy or custom must cause the constitutional violation). No reasonable juror could conclude that a policy that supposedly existed in 2003 caused the deprivation of Dormu's rights in 2007. Although Klotz, in his affidavit, opines that Dormu's arrest was an "example" of a pattern of inappropriate arrests, such an assertion is not enough to prove causation. To survive summary judgment, Dormu cannot rely on mere allegations; he must provide competent evidence. *See Celotex*, 477 U.S. at 324. Summary judgment must therefore be granted with respect to the District's liability for any § 1983 claims.

**D. Dormu Cannot Rely on the Deliberate Indifference Theory to Establish Municipal Liability under § 1983**

A municipality's failure to train, supervise, or discipline employees can render a municipality liable under § 1983, "when it can be said that the failure amounts to 'deliberate indifference towards the constitutional rights of persons in its domain.'" *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (quoting *City of Canton*, 489 U.S. at 388–89 & n.7). This rule means "that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). In order to prevail, "a plaintiff must demonstrate a close link between the alleged injury and the alleged deficiency in training." *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996).

In this case, although Dormu does not explicitly attribute his injuries to the District's deliberate indifference in the hiring, supervision, or training of the officers, Dormu's expert report could plausibly be interpreted as suggesting that the District was deliberately indifferent to an unconstitutional policy. The policy, Klotz appears to suggest, is arresting individuals for disorderly conduct, when in fact the true purpose of the arrest "is what is known in police circles as, 'Contempt of Cop.'" *See* Defs.' Mem. in Supp. of Summ. J., Ex. 5 at 4 (Expert Report of Klotz).[13] Klotz's expert report concludes that "the District of Columbia and the [MPD] have long been aware of the problems with improper disorderly conduct arrests but have failed to take effective and proper police action, training, supervision and oversight of this problem." *Id.* at 6.

---

[13] In his affidavit, Klotz also refers to this practice as "retaliatory" disorderly conduct arrests. Pl.'s Opp'n, Ex. 6 ¶ 12 (Aff. of Klotz) ("Klotz Aff."). He further states that as part of this practice, "the majority of the arrests are disposed of before prosecutorial review by offering the arrestee a choice between time in jail awaiting presentment at Superior Court or release from the station house by 'post & forfeit.'" *Id.* ¶ 14. According to Klotz, "post and forfeit" refers to paying money to be released from jail "and does not require an officer to appear at court for papering, so that the officer never has to justify the arrest to a prosecutor." *Id.*

Klotz appears to reach this conclusion based on the 2003 report issued by the Citizen Complaint Review Board.

While it could be inferred that the 2003 report put the District on notice of a practice of improper disorderly conduct arrests by the MPD, the Court cannot assume that the District continued to be on notice four years later when Dormu was arrested. As the court concluded in determining whether an agreement reached in 1999 put the District on notice of the same problem a year later, "a mere awareness of a problem [at an earlier time] and a need for improvement is not, as a matter of law, sufficient to impose municipal liability for an incident that occurred [at a later date]." *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 55 (D.D.C. 2005). Accordingly, to the extent Dormu asserts a deliberate indifference theory, the Court concludes that the District is not liable under such a theory.

**E.     Common Law False Arrest and False Imprisonment**

Under District of Columbia law, "'[f]alse arrest' is indistinguishable as a practical matter from the common law tort of 'false imprisonment.'" *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010).[14] In order to maintain an action for either tort, a plaintiff must demonstrate: "(1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint." *Id.* (quoting 32 Am. Jur. 2d False Imprisonment § 7 (2007)).

In *Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009), the Court of Appeals for the District of Columbia recognized that there are two affirmative defenses to the torts of false arrest and imprisonment. The first is the "probable cause test," under which the actions of a

_____

[14]     The parties do not dispute that District of Columbia law applies to Dormu's common law causes of action.

police officer will be deemed lawful if the officer had "'constitutional probable cause.'" *Id.*
(quoting *District of Columbia v. Murphy*, 635 A.2d 929, 932 (D.C. 1993)).  The second is the
"partially subjective test" under which "it will suffice if the officer can demonstrate that (1) he or
she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was
reasonable."  *Id.* (quoting *Murphy*, 635 A.2d at 932).

Defendants argue that they are entitled to summary judgment as to Dormu's false arrest
and false imprisonment claims.  Defs.' Mem. in Supp. of Summ. J. at 19.[15]  In particular, they
argue that the partially subjective test shields them from liability.  *Id.* at 16, 19 (stating that the
"subjective test" may justify arrest and that a plaintiff has "no cause of action if the officer had a
reasonable good faith belief at the time that his or her conduct was lawful").   Defendants'
argument must fail.  Although even an objectively unlawful arrest may be justified at common
law by recourse to the partially subjective test, here defendants have not pointed to any evidence
in support of their argument that the officers had a reasonable good faith belief that their conduct
was lawful.  *See generally* Defs.' Mot. for Summ. J; *see also Celotex*, 477 U.S. at 322–23 ("[A]
party seeking summary judgment always bears the initial responsibility of informing the district
court of the basis for its motion, and identifying those portions of the [record] which it believes
demonstrate the absence of a genuine issue of material fact.") (internal quotation marks omitted).
As such, the Court denies defendants' motion for summary judgment with respect to Dormu's

_____

[15]       Defendants do not make this argument separately from their argument that
probable cause shields them from Fourth Amendment liability.  The Court nonetheless addresses
this argument because Dormu had an opportunity to respond to it.  In his memorandum opposing
summary judgment, Dormu includes a section specifically addressing his false arrest and
imprisonment claims in which he argues he should be allowed to proceed with those claims.  *See*
Pl.'s Opp'n at 13–14.

common law false arrest and imprisonment claims.

## F. Assault and Battery

Dormu argues that the individual officers assaulted and battered him during his arrest.
Under District of Columbia law, a police officer is privileged to use force so long as the "means
employed are not in excess of those which [he] reasonably believes [are] necessary." *Etheredge
v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (internal quotation marks omitted). This
inquiry is done "from the perspective of a reasonable officer on the scene," with allowance for
the officer's need to make quick decisions under potentially dangerous circumstances. *Id.*
(quoting *Graham*, 490 U.S. at 396–97). "This standard is similar to the excessive force standard
applied in the Section 1983 context." *Rogala*, 161 F.3d at 57 (citing *Etheredge*, 635 A.2d at 915
n.10). Believing Dormu's evidence for purposes of ruling on a motion for summary judgment, a
fact-finder could conclude that it was not reasonable for Janczyk to maintain Dormu's handcuffs
in an excessively tight position after Dormu complained. The Court reaches this conclusion for
the same reasons described above in analyzing Dormu's excessive force claim under § 1983.
Also for the same reasons discussed above, Dormu's assault and battery claims must be
dismissed with respect to Clifford, Kyle, and Pinto, as Dormu has failed to point to any evidence
demonstrating their liability. Accordingly, the Court denies defendants' motion for summary
judgment on Dormu's assault and battery claim with respect to Janczyk and grants it with respect
to Clifford, Kyle, and Pinto.

## G. Negligence

Defendants seek summary judgment on Dormu's negligence claim, arguing both that
Dormu has not established a national standard of care and that his negligence claim is not

"separate and distinct" from his assault and battery claim. Defs.' Mem. in Supp. of Summ. J. at 23–26. Dormu counters that he has met his burden in pleading a viable negligence claim based on Janczyk's allegedly improper handcuffing. The Court agrees with Dormu.

### 1.    Dormu Has Established a National Standard of Care

Defendants argue that Dormu's negligence claim must fail because Dormu has not presented sufficient evidence to establish a national standard of care. Although defendants' position had merit at the time they moved for summary judgment, the Court finds that Dormu's supplemental expert affidavit saves his negligence claim.[16]

To prevail on a negligence cause of action under D.C. law, a plaintiff must prove "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Evans-Reid v. District of*

---

[16]    Defendants have moved to strike the supplement [#41]. They contend that there is no authority for the supplemental filing; that the filing amounts to a late attempt to fix the original affidavit; and that the filing is prejudicial because defendants relied on the expert's prior information in briefing their motion for summary judgment. Although the Court agrees with defendants that Dormu has no "right" to amend his expert's affidavit, the Court has discretion to permit such a filing. The Court will allow the filing because the purpose of Fed. R. Civ. P. 26 is not harmed by allowing the amendment. Rule 26 was designed to "prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert, and to prepare for depositions and cross-examinations at trial." *Iacangelo v. Georgetown Univ.*, 2011 WL 13573, at *1 (D.D.C. Jan. 4, 2011). Here, there is no such surprise. The supplemental affidavit sets forth references, not new opinions, and therefore does not blindside defendants with new information. Furthermore, Dormu's motion comes several months prior to trial, leaving defendants with sufficient time to adjust their trial preparation. And although defendants prepared their summary judgment motion based on the expert's previous submissions, they did not hinge their entire argument for dismissing Dormu's negligence claim on the expert's failure to reference proper citations. Accordingly, the Court concludes that the harm to defendants does not justify striking the supplemental affidavit. Any harm they do experience, however, can be minimized by allowing defendants to depose the expert if they so choose. *See Albert v. Warner-Lambert Co.,* 2002 WL 745822, *1 (D. Mass. April 24, 2002) ("[I]n lieu of preclusion, the court will allow [the expert] to supplement his report contingent upon his being made available for up to four hours of additional direct deposition testimony at [plaintiff's] expense.").

*Columbia*, 930 A.2d 930, 937 n.6 (D.C. 2007) (internal quotation marks omitted). In cases involving allegations of excessive use of force, the applicable standard of care is that of a reasonably prudent police officer. *Smith v. District of Columbia*, 882 A.2d 778, 788 (D.C. 2005). Expert testimony to establish the applicable standard of care is required in such cases because "[t]he applicable standard of care in cases of this kind is beyond the ken of the average lay juror." *Etheredge*, 635 A.2d at 917 (internal citation and quotation marks omitted).

Where expert testimony is necessary, the D.C. Court of Appeals has held that "'the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured.'" *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)). That standard of care "is to be found in the practices in fact generally followed by other comparable governmental facilities or some nationally-recognized standard." *Evans-Reid*, 930 A.2d at 936 (internal citations and quotation marks omitted). The D.C. Court of Appeals has also held that internal guidelines and policies do not establish a standard of care, *see Clark*, 708 A.2d at 636, but "may properly be received in evidence as bearing on the standard of care." *District of Columbia v. Wilson*, 721 A.2d 591, 598 n.13 (D.C. 1998) (internal citation and quotation marks omitted).

Here, Dormu's expert initially submitted an affidavit stating that "to handcuff and fail to adjust the handcuffs as necessary when notified they are causing pain . . . would be contrary to national and local police standards." Pl.'s Opp'n, Ex. 6 ¶ 8 (Aff. of Klotz) ("Klotz Aff."). As evidence of the standard of care, he referenced an MPD training bulletin on the use of handcuffs, but nothing else. *See id.* ¶¶ 8–10 (citing MPD Training Bulletin 79-2). Because the initial expert report and affidavit failed to reference any other local or national policy or procedure to establish

the standard of care, the Court would have been required, based on those submissions, to grant summary judgment in favor of defendants with respect to Dormu's negligence claim.

After defendants' summary judgment motion was briefed, however, Dormu moved for leave to supplement his expert report [#43].[17] In the supplemental affidavit, Klotz states that he has "been asked to state the further basis" for his opinions regarding the prevailing national standards with respect to police handcuffing. Pl.'s Supplemental Opp'n, Ex. 1 ¶ 3 (Supplemental Aff. of Klotz). He further states that the standard set forth in his expert report and original affidavit are "set out in a Department of Justice Approved [L]esson Plan for use of force curriculum for 2005–2006;" has been "followed and enforced by the International Association of Chiefs of Police;" and is set forth in "Patrol Operation and Enforcement Tactics . . . , an authoritative text followed by police departments nationwide." *Id.* ¶¶ 5–7. These amendments, considered alongside Klotz's original submissions, sufficiently "articulate *and reference* a standard of care." *Clark*, 708 A.2d at 635 (internal citation and quotation marks omitted)). Summary judgment in favor of defendants therefore cannot be granted on the basis of inadequate support for the standard of care.

### 2. Dormu May Bring Negligence Claim Alongside Assault and Battery Claims

Under District of Columbia law, a plaintiff who simultaneously asserts claims for negligence and assault and battery based on excessive force must ensure that the negligence claim is: (1) "distinctly pled;" (2) "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself;" and (3) "violative of a distinct

_____

[17] Before moving for leave to supplement his expert report, Dormu filed the supplement without seeking leave to do so [#40]. He subsequently submitted a proper motion seeking the Court's leave [#43].

standard of care." *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003). These requirements stem from the different states of mind that each theory of liability requires. Battery and assault are intentional torts. *Id.* at 706. Negligence is not. "'Intent and negligence are regarded as mutually exclusive grounds of liability. As the saying goes, there is no such thing as a negligent battery.'" *Id.* (quoting 1 DOBBS, LAW OF TORTS § 26 at 51 (2001)). The D.C. Court of Appeals has nonetheless held that there are "certain circumstances [in which] the events surrounding the application of excessive force may lend themselves to a theory of negligence as well" as assault and battery. *Id.* at 707.[18]

Dormu has satisfied *Chinn*'s three requirements. First, Dormu pleads his negligence claim separately from his claims for assault and battery. *See* Compl. at ¶¶ 8–9, 22–23 (setting forth distinct claims for negligence and assault and battery). The second *Chinn* requirement, that the negligence claim be "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself," is also met. *Chinn*, 839 A.2d at 711. Dormu maintains that "Jancyzk either intentionally or recklessly failed to lock the handcuffs[.]" Pl.'s Opp'n at 18. The Court agrees that Dormu's evidence, viewed in a light most favorable to him, can support these two scenarios—that is, that Jancyzk either intentionally applied the handcuffs tightly and deliberately failed to lock the handcuffs, or that he recklessly believed that

---

[18]        Surveying its case law, the D.C. Court of Appeals noted that plaintiffs have been allowed to submit both negligence and battery claims to a jury in cases that shared "common characteristics," including: (1) the use of deadly force; (2) the invocation of a police regulation establishing a standard of care distinct from the excessive force standard; (3) the presence of "alternate scenarios in at least one of which a distinct act of negligence, a misperception of fact, may have played a part in the decision" to use deadly force; and (4) the presence of a negligent act that preceded the pulling of the trigger. *Chinn*, 839 A.2d at 710–11. The *Chinn* court did not, however, hold that all four of these factors must be present for a plaintiff to successfully submit both negligence and assault and battery claims to a jury. *See id.*

he had properly applied the handcuffs. In this sense, Dormu's claim is similar to other cases in which plaintiffs have been allowed to submit both theories of liability to a jury. For instance, in *District of Columbia v. White*, 442 A.2d 159 (D.C. 1982), there "were two scenarios for the shooting, one where the decedent was standing with empty hands having stopped fleeing, and the other where the officer shot in self-defense as the decedent turned toward him with what was thought erroneously to be a gun." *Chinn*, 839 A.2d at 708–09 (discussing *White*, 442 A.2d at 162–63). The second of Dormu's two scenarios—that Janczyk recklessly believed that he had properly applied the handcuffs—also shares one of the features the *Chinn* court identified as common in cases where plaintiffs have been allowed to proceed: it involves a possible "misperception of fact." *Id.* at 711.

The third *Chinn* requirement—that there be a violation of a "distinct standard of care," *Chinn*, 939 A.2d at 711—is also satisfied. Dormu contends there is a standard of care that requires police officers to ensure that the handcuffs "be double locked to prevent further closing of the cuff either accidently or purposely, and that the officer is required to close the cuff firmly but not so tightly as to cause the prisoner undue discomfort." Pl.'s Opp'n at 18 (citing Klotz Aff. ¶¶ 7–10). He also contends that Janczyk[19] violated that standard of care. The handcuffing procedure invoked by Dormu is distinct from the general excessive force standard that applies to MPD officers. *See* D.C. Code § 5-123.02 (proscribing officers from "using unnecessary and

_____

[19] Although Dormu states that he complained to "defendants that the handcuffs were painful," suggesting that perhaps all of the officers acted negligently by not heeding his complaints and loosening the cuffs, the standard of care Dormu invokes references only the "handcuffing officer." Pl's Opp'n at 18; Klotz Aff. ¶ 9. The Court therefore concludes that Dormu's negligence claim can only proceed against Janczyk, who applied the handcuffs, and that the claim must be dismissed as to Pinto, Clifford, and Kyle.

wanton severity"). Thus, the standard of care identified by Dormu does not create the problem

that *Chinn* sought to avoid. In *Chinn*, the D.C. Court of Appeals was concerned that "[i]t is

tautological to speak of the standard of care as being the duty not to use excessive force[.]" 839

A.2d at 711. Accordingly, Dormu has satisfied *Chinn*'s three requirements, and, pursuant to

*Chinn*, may present a negligence claim to the jury alongside his assault and battery claims.

## H.    Negligent Supervision

Defendants contend that Dormu has presented "absolutely no evidence" to support a

negligent hiring, retention, or supervision claim, such that Dormu's claims must fail as a matter

of law. Defs.' Mot. in Supp. of Summ. J. at 26. Dormu rejoins that he has offered sufficient

evidence, through his expert, that would support a claim of "negligent supervision."[20] Pl.'s

Opp'n at 22. Defendants' argument is persuasive.

To establish a claim for negligent supervision, "it is incumbent upon a party to show that

an employer knew or should have known its employee behaved in a dangerous or otherwise

incompetent manner, and that the employer, armed with that actual or constructive knowledge,

failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.

1985) (emphasis omitted). Furthermore, a plaintiff must show that the employer's negligence

was a substantial factor in causing the plaintiff's injury. *Tarpeh-Doe v. United States*, 28 F.3d

120, 124 (D.C. Cir. 1994) ("The substantial factor test . . . is part of the District's law of

---

[20]    In his opposition brief, Dormu contends only that the District "is liable for the
negligent supervision of the defendants Jancyzk, Pinto, Clifford and Ramey." He does not make
any mention of the other negligence theories alleged in his complaint. *See* Compl. ¶¶ 24–25
(alleging in Count IX a claim for "Negligent Hiring, Retention and [S]upervision").
Accordingly, defendants' motion for summary judgment is granted with respect to Dormu's
negligent hiring and retention claims.

negligence.") (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 319–20 (D.C. 1980)).

Here, Dormu maintains that a triable issue exists because he contends that the District and MPD were aware of a pattern of improper disorderly conduct arrests and failed to take effective action to eliminate the problem. Pl.'s Opp'n at 22. In support of this argument, Dormu cites to Klotz's affidavit, which describes the 2003 Citizen Complaint Review Board report regarding disorderly conduct arrests and states that the District "has long been aware" of a "pattern and practice" of improper disorderly conduct arrests and failed to take adequate action. Pl.'s Opp'n, Ex. 6 ¶¶ 13–15 (Aff. of Klotz). Dormu's evidence is not enough. Dormu has not presented any evidence in support of the causation requirement. That is, he has failed to establish that the District or MPD's alleged failings were a substantial factor in causing the arrest. Accordingly, the Court grants summary judgment as to Dormu's negligent supervision claim.

I.    **Malicious Prosecution**

To sustain a claim for malicious prosecution of criminal charges under District of Columbia law, a plaintiff must prove: (1) the initiation of a criminal proceeding by the defendant; (2) with malice; (3) without probable cause; and (4) termination of the proceeding in favor of the plaintiff. *Bumphus v. Smith*, 189 A.2d 130, 131 (D.C. 1963). The second element of a malicious prosecution cause of action requires proof of either "actual malice" or a "willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff." *Tyler v. Cent. Charge Serv., Inc.*, 444 A.2d 965, 969 (D.C. 1982) (per curiam). As to the third element, the probable cause inquiry does not ask "whether there was probable cause for the initial arrest, but whether there was probable cause for the 'underlying suit.'" *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (quoting *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002)). In

addition, the existence of probable cause depends "upon the honest belief of the person instituting" the legal proceedings, *Ammerman v. Newman*, 384 A.2d 637, 640 (D.C. 1958), and not upon a plaintiff's guilt or innocence. *See Lyles v. Micenko*, 468 F. Supp. 2d 68, 76 (D.D.C. 2006).

Defendants argue that they are entitled to summary judgment on Dormu's malicious prosecution claim because "probable cause existed for plaintiff's arrest," and because "[t]here is no evidence in this record that plaintiff's prosecution was based on any evil motive." Defs.' Mot. for Summ. J. at 21. The Court disagrees with respect to probable cause, and agrees in part with respect to malice.

As has previously been discussed, a reasonable juror could conclude that defendants lacked probable cause to arrest Dormu. *See supra*. The Court is mindful that probable cause to arrest and probable cause to initiate proceedings are not the same. *See Pitt*, 491 F.3d at 502. For purposes of ruling on defendants' motion for summary judgment, however, the distinction is irrelevant. The same evidence that would permit a fact-finder to find that Dormu was arrested without probable cause would permit a fact-finder to conclude that defendants instituted the criminal proceedings without probable cause.

As to the malice requirement, the Court finds that Janczyk's alleged use of the racial epithet "nigger" could support a finding of malice. Pl.'s Opp'n, Ex. 1 at 18 (Dep. of Dormu). Dormu has not, however, satisfied his burden with respect to the other officers. Dormu points to Clifford's statement that had Dormu responded to the officers differently, the officers "would have walked away" and the traffic stop would not have resulted in an arrest, as well as Clifford's statements that Janczyk is a "hothead" and that Janczyk went "overboard." Pl.'s Opp'n at 16 n.

17.  The Court fails to see how these alleged statements show either "actual malice" or a "willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff." *Tyler*, 444 A.2d at 969.  Dormu does not point to any evidence suggesting malice on the part of either Kyle or Pinto.[21]

Thus, defendants' argument regarding the probable cause element is not persuasive. With respect to the malice element, defendants' argument is not persuasive as to Janczyk, but is as to Clifford, Kyle, and Pinto.  Dormu has offered evidence demonstrating that there is a genuine issue for trial on Janczyk's liability for malicious prosecution, but not the other officers. Accordingly, the Court denies in part and grants in part defendants' motion for summary judgment with respect to the malicious prosecution claim.

## J.    Abuse of Process

Under District of Columbia law, the tort of abuse of process allows plaintiffs to recover where they can show that a defendant has used the legal system "to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992) (internal quotation marks omitted).  Although the D.C. Court of Appeals has left the tort's "exact elements far from clear," *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009), the existence of an ulterior motive is not enough.  *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).  In addition to ulterior motive,

---

[21]      In their reply memorandum, defendants argue that the malicious prosecution claim must fail because Dormu's evidence regarding malice stems from the time of his arrest, not the time at which the criminal proceedings were initiated.  The Court rejects this argument.  A reasonable juror could conclude that any malice that Janczyk harbored at the time of the arrest continued to exist at the time of the criminal proceedings.

"one must allege and prove that there has been a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge." *Id.*

In this case, Dormu argues that he should be allowed to maintain his abuse of process claim because Klotz's affidavit suggests that defendants had a retaliatory purpose in arresting him. *See* Pl.'s Opp'n at 17. This evidence, however, is insufficient. Even if the arrest was effected with a retaliatory motive, Dormu's abuse of process claim would still fail. In order to maintain an abuse of process claim, Dormu would have to show more than improper motive; he would also have to establish that defendants used the judicial process for a purpose for which the process is not intended. *Morowitz*, 423 A.2d at 198.

In addition, Dormu points to the portion of Klotz's affidavit in which Klotz concludes that Dormu's arrest was in violation of national police standards because the officers lacked probable cause. Pl's Opp'n, Ex. 6 ¶ 4 (Aff. of Klotz). Again, this evidence is insufficient. D.C. courts have been hesitant to find any relationship between the existence of probable cause and a claim of abuse of process. *See Bown*, 601 A.2d at 1080 n.14 (suggesting it may be preferable to limit claims asserting lack of probable cause to malicious prosecution)*; Hall v. Field Enterprises, Inc.*, 94 A.2d 479, 481 (D.C. 1953) (providing that action for abuse of process "will lie . . . regardless of whether there was probable cause for its issuance"); *see also Whelan v. Abell*, 953 F.2d 663, 670 (D.C. Cir. 1992) (observing that only tort of malicious prosecution—but not abuse of process—requires a showing of lack of probable cause).

Because none of Dormu's evidence demonstrates that defendants did not use the legal process for the purposes for which it was intended—prosecution of failure to obey and disorderly conduct charges—summary judgment in favor of defendants is appropriate with respect to this

claim.

**K.      Punitive Damages**

Finally, defendants argue that they are entitled to summary judgment on Dormu's claim for punitive damages against the individual officers because Dormu has not provided any evidence that the officers acted with any malice against him.[22]  Dormu responds with several arguments, including that the officers' comments during the course of the arrest demonstrate that the individual officers acted maliciously toward him.

In order to be awarded punitive damages under District of Columbia law, a plaintiff must show that the defendant's act was committed "with an 'evil motive, actual malice, deliberate violence or oppression'" or otherwise establish "'outrageous conduct in willful disregard for another's rights.'"  *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C. 2004) (citing *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C. 1998)).   This requirement reflects the fact that punitive damages are not favored by courts.  *King v. Kirlin Enters., Inc.*, 626 A.2d 882, 884 (D.C. 1993). Direct evidence is not necessary to prove the requisite state of mind; rather, a defendant's state of mind "may be inferred from all the facts and circumstances of the case."  *Robinson*, 535 A.2d at 906.

With respect to Janczyk, the Court concludes that Dormu has presented sufficient facts in support of his punitive damages claim.  Janczyk allegedly referred to Dormu as a "nigger" and ignored his complaints about too-tight handcuffs.  A reasonable juror could conclude that the

_____

[22]       In their memorandum in support of summary judgment, defendants also argue that punitive damages are not available against the District.  Defs.' Mem. in Supp. of Summ. J. at 27–28.  Dormu subsequently abandoned any claim that the District could be liable for punitive damages.  *See* Pl.'s Opp'n at 6.

epithet, in addition to Janczyk's alleged refusal to respond to Dormu's complaints about the overly tight handcuffs, would prove malice by Janczyk towards Dormu. *See Tolliver v. Amici*, 800 F.2d 149, 151 (7th Cir. 1986) (finding racial slurs to constitute evidence of ill will or malice to support award of punitive damages).[23]  Accordingly, the Court denies defendants' request for summary judgment on the issue of punitive damages with respect to Janczyk.

As to the other defendants, however, Dormu has not provided any evidence that would merit the award of punitive damages.  Dormu offers absolutely no evidence in support of punitive damages against Pinto or Kyle.  With respect to Clifford, Dormu relies upon Clifford's testimony during his deposition in which Clifford indicated the traffic stop would not have escalated into an arrest had Dormu "at the onset said, I'm good, I'm fine, I'm okay, Officer." Pl.'s Opp'n, Ex. 9 at 39 (Dep. of Clifford).  Dormu does not explain how this testimony could demonstrate malice by Clifford toward Dormu, or even willful disregard.  Accordingly, the Court finds that Dormu's claim for punitive damages against Clifford must fail.  His claim for punitive damages against Pinto and Kyle also fail because Dormu has not pointed to any evidence at all.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment or, in the alternative, for judgment on the pleadings.  In addition, the Court grants Dormu's motion seeking leave to file a supplemental expert affidavit and denies

---

[23]    Dormu contends that additional statements made by Janczyk satisfy the mental state requirement for punitive damages; for example, Dormu notes that Janczyk allegedly told Dormu to "shut the fuck up, now you are going to jail." Pl.'s Opp'n at 23.  The Court need not decide whether such statements are sufficient to prove punitive damages, as the Court has determined that Janczyk's use of the word "nigger" and the allegations regarding handcuffing are enough.

defendants' motion to strike that supplement.  An appropriate order accompanies this

memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge